TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00649-CR






James Rex McCelvey, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT


NO. 995058, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING






O P I N I O N




 Appellant James Rex McCelvey, an operator of a retail public utility that possessed
a certificate of convenience and necessity, appeals his third-degree felony conviction under the Texas
Water Code, for willfully and knowingly failing to render continuous and adequate service on or
about March 19, 1997, within the utility's certified area. The indictment alleged that the water
supplied exceeded the maximum contaminant level of 0.005 milligrams per liter for benzene set by
the Texas Administrative Code, Title 30, section 290.103(3)(B) and in violation of Title 30, section
291.93 of the same code. See Tex. Water Code Ann. §§ 13.250(a), 13.415 (West 2000); 30 Tex.
Admin. Code §§ 290.103(3)(B), (1) 291.93 (2) (1997).

 The jury found appellant guilty under count II of the indictment. The trial court
assessed appellant's punishment at five years' imprisonment. The imposition of the sentence was
suspended and the appellant was placed on community supervision for five years subject to certain
conditions including the payment of a $5,000 fine.


Points of Error

 Appellant advances two points of error. He contends therein that the evidence is
legally and factually insufficient to sustain the conviction. 


Legal Background

 This case is apparently one of first impression--a criminal conviction under Chapter
13 of the Texas Water Code. Appellant was indicted for an offense under sections 13.250(a) and
13.415 of the water code, an offense outside the Texas Penal Code. The penal code does not define
all criminal conduct. A number of criminal offenses are defined by other codes. See 6 Michael B.
Charlton, Texas Practice: Criminal Law § 1.2 (2001) (hereinafter Charlton). The penal code,
however, attempts to limit the scope of penal laws, and makes some effort at uniformity. Id. (3)

 We believe that a discussion first of the legal background of the case will place
appellant's contentions in proper perspective. Section 13.415 of the water code provides:


Any person who willfully and knowingly violates this chapter is guilty of a third
degree felony.



Tex. Water Code Ann. § 13.415 (West 2000). (4)

 The term "violates this chapter" is not further clarified. Conduct in the form of an
act or omission is not mentioned. See Tex. Pen. Code Ann. § 6.02 (West 2003). Obviously, "this
chapter" would include all subchapters, sections, subsections, and provisions found therein. Chapter
13 consists of subchapters A through N, sections 13.001-13.515, and generally concerns
discontinuance, reduction, and impairment of service. 

 In the instant case, under count II of the indictment, the prosecution has chosen
section 13.250(a) out of subchapter G as the basis of prosecution under section 13.415. Section
13.250(a) provides:



 Except as provided by this section or Section 13.2501 of this code, any retail
public utility that possesses or is required to possess a certificate of public
convenience and necessity shall serve every consumer within its certified area
and shall render continuous and adequate service within the area or areas.




Tex. Water Code Ann. § 13.250(a) (West 2000).

 The State relied upon the phrase "and shall render continuous and adequate service
within the area or areas." This language imposed a duty upon any retail public utility as described
in the statute. The State alleged an omission thereunder--the failure to render adequate service. The
exception to the statute is found in section 13.2501, which is not an issue in this case. (5) See also Tex.
Pen. Code Ann. § 6.02 (West 2003). 


Indictment

 The indictment originally contained nine counts. At trial, the State elected to proceed
only on count II, which had been twice amended. The amended count II of the indictment, omitting
the formal parts, provided that on or about March 19, 1997, appellant: 


while operating a retail public utility that possessed a certificate of public
convenience and necessity, to wit: the Choke Canyon Water System, did then and
there willfully and knowingly fail to render continuous and adequate service within
its certified area, to wit: the water contained levels of benzene concentrations that
exceeded the Maximum Contaminant Level of 0.005 mg/l for benzene under the
Drinking Water Standards for Public Water Supply Systems, Title 30, Section
290.103(3)(B) of the Texas Administrative Code, and in violation of title 30, Section
291.93 of the Texas Administrative Code. And further, [Appellant] was not required
to refuse to serve a customer within the certified area and was not prohibited from
providing the service under Section 13.2501 of the Texas Water Code. 



 These allegations sought to charge appellant with an omission--a failure to render
the duty of providing continuous and adequate service under section 13.250(a) of the water code. 
Title 30 of the Texas Administrative Code contains regulations concerning environmental quality. 
Chapter 290 thereof is titled "Water Hygiene" and subchapter F of Title 30 includes the regulations
regarding drinking water standards governing quality and reporting requirements for public water
supply systems. See 30 Tex. Admin. Code chapter 290 (1997), in effect at the pertinent time periods. 
Section 290.101 provides in part: 


The purpose of these standards is to assure the safety of public water supplies with
respect to microbiological, chemical, and radiological quality and to further efficient
processing through control tests, laboratory checks, operating records, and reports of
public water supply systems.



30 Tex. Admin. Code § 290.101 (2004). (6)

 Section 290.103(3)(B) relates to violatile organic chemicals (VOCs). This section
provides that the maximum contaminant level for the VOCs apply to community water systems and
such level for benzene is 0.005 MCL (mg/l). (7) Section 291.93(b) of Title 30 of the administrative
code provides:



 Quality of product.

 
 Each retail public utility which possesses or is required to possess a
certificate of convenience and necessity shall furnish water which meets the
minimum quality criteria for drinking water prescribed by the commission. 
A utility or water supply corporation which is authorized to operate without
a certificate of convenience and necessity pursuant to § 13.242(c) of the
code may be required by the executive director to meet the minimum
criteria prescribed by the commission if so instructed in writing. 

 Each retail public utility must promptly take all reasonable actions
necessary to protect the health of its customers at all times. 

 
 Maintenance of Facilities. Every retail public utility shall maintain its facilities
to protect them from contamination, ensure efficient operation and promptly
repair leaks. 




30 Tex. Admin. Code § 291.93(b) (1997). (8)

 The State takes the position that the offense arose under the water code, and that
references in the indictment to the administrative regulations were made only to provide notice to
appellant as to the manner in which how the prosecution intended to prove failure to render adequate
water service. The State denies any attempt in count II to "criminalize" the administrative
regulations set forth in the amended indictment. 

 There was no motion to quash or set aside count II of the indictment at trial. See Tex.
Const. art. V, § 5; Tex. Code Crim. Proc. Ann. art. 1.14(b) (West Supp. 2004). Other than his legal
and factual sufficiency issues, appellant has not challenged the pleadings nor questioned the
constitutionality of the statutes involved. 


Facts

 The record reflects without dispute that at all pertinent times appellant James Rex
McCelvey operated the Choke Canyon Water System, a retail public utility that possessed a
certificate of public convenience and necessity, located in Live Oak and McMullen Counties. (9) 
Sometime in the early 1980s, appellant acquired the Wheeler well, which had been drilled by the
Shell Oil Company and capped. Appellant converted the well into a water well. He began supplying
water to certain individuals and companies, obtained a certificate of convenience and necessity, and
began to use other wells, the Woodward and Horton wells. Appellant incorporated the El Oso Water
System into his own, and established a water treatment plant for water taken from Choke Canyon
Lake built by the United States Corps of Engineers. Drought came to South Texas and in the
summer of 1995, the lake water level fell and the United States Department of the Interior, Bureau
of Reclaimation "would not permit appellant to extend his pipes further into the lake." The water
treatment plant was closed, and appellant turned to his water wells including the Wheeler well, as
a continuing source of water for some of his customers.

 The record deals primarily with the offense charged but is also indicative of
appellant's ongoing turbulent relationship with the Texas Natural Resources Conservation
Commission (TNRCC), now the Texas Commission on Environmental Quality, (10) about compliance
with numerous regulations. 

 The instant case mostly concerns the water samples taken from the Wheeler well at
entry point number one (11) and the test results showing benzene in drinking water being distributed. 
The record shows, and appellant acknowledges, that benzene is a volatile organic chemical that may
cause cancer if a person is exposed to a significant amount of it. Benzene is absorbed through a
person's digestive system and may affect bone marrow and cause leukemia. Texas has adopted the
federal standards, and as noted, the maximum contaminant level for benzene is 0.005 milligrams per
liter or five micrograms per liter. 

 The record is silent as to whether Choke Canyon Water System had any difficulty
with benzene in its water sources prior to December 8, 1995. The system was apparently on an
annual or less frequent inspection schedule before that date. On December 8, 1995, the water from
entry point number one at the Wheeler well tested at 9.8 micrograms of benzene per liter, exceeding
the maximum contaminant level. 

 Further tests by the TNRCC on January 12 and 19, 1996, of the Wheeler well water
reflected benzene in the amount of 9.2 and 9.4 micrograms per liter, respectively. Manuel Saenz of
TNRCC orally instructed James Jones, appellant's operator, to shut off the Wheeler well in January
after the above test results were available. On January 24, 1996, appellant was sent a written notice
of violation and instructed to consult an engineer. He was allowed fourteen days to notify customers
of the violation. Mickey Garza, a TNRCC water section manager, testified that on January 25, 1996,
Jones told him that the Wheeler well had been taken out of service. Garza reported that as a result,
TNRCC "backed off any further monitoring until we could go back and confirm it." In February
1996, the Choke Canyon water system was placed on quarterly monitoring. See 30 Tex. Admin.
Code § 290.109(b)(15)(A), (B) (1997). 

 The next testing by TNRCC on the Wheeler well water was on August 28, 1996,
which showed that the water contained 5.4 micrograms per liter of benzene at entry point number
one. The test on that date of water taken at the Wheeler wellhead showed 11 micrograms of benzene
per liter. On September 4, 1996, the test at entry point one reflected that the water there contained
6.3 micrograms of benzene per liter and the test at the Wheeler wellhead showed 14 micrograms of
benzene. The test on October 29, 1996, at the said entry point showed less than 5 micrograms per
liter of benzene. Still further tests on March 3 and 19, 1997, showed 5.7 and 13 micrograms of
benzene per liter in the water taken from entry point number one, respectively. The State used the
last testing date as the "on or about" date alleged in the indictment. After March 19, 1997, the
Wheeler well was shut down by appellant. 

 Dr. Robert Benson, who holds a Ph.D. in biochemistry and is a toxicologist with the
federal Environmental Protection Agency (EPA) in Denver, Colorado, testified for the State. Benson
explained that benzene is a known human carcinogen that can cause cancer, and discussed its
industrial application and how it may be absorbed by an individual exposed to it. Benson stated that
the maximum contaminant level goal for benzene is zero because it is a carcinogen. He noted that
the principle reason the maximum contaminant level is set at five micrograms per liter of benzene
is because that is the level at which chemical laboratories can reliably and accurately measure
benzene in a water sample. Dr. Benson observed that the federal and state regulations in this regard
were the same. He was of the opinion that drinking water that did not meet the required maximum
contaminant level was not adequate. 

 Dorothy Young, specialist with the enforcement division of TNRCC, testified that
she worked on appellant's case from November 30, 1995, until September 1, 1997. She recalled a
screening committee meeting on November 30, 1995, and noted that appellant's case was "sort of
unusual" as complaints of regulatory violations came from three different directions, the regional
office dealing with water pressure and capacity issues and nonresponsiveness, the central office
dealing with water quality, and the consumer assistance office concerned with appellant's failure to
refund overcharges and illegal fees. Any enforcement action was tabled on November 30, 1995,
pending appellant's response to a request that he refund some customers. Young did not recall that
any benzene problem was addressed at the meeting. Later, Young became aware of the notice of
violation letter of January 24, 1996. On May 13, 1996, a "Notice of Enforcement Action" was sent
to appellant by certified mail. It noted the letters of violations dated January 24 and March 28, 1996,
and enclosed a proposed agreed order assessing a reduced penalty of $3,296.00 if compliance was
completed within certain time limits. 

 Young had difficulty getting appellant to pick up the certified mail. Young talked to
appellant on June 12, 1996, via the telephone. He complained that he was being drowned in
paperwork and had "to answer to so many people." Young faxed a copy of the proposed
administrative order to appellant. She explained that the order was a "one-shot deal" with time
limits. Appellant met with Young and other TNRCC staff members in Austin on June 19, 1996. 
Young stated that the meeting covered a "lot of territory" about the benzene problem and the hot
water being delivered to customers. She further explained that it was confusing as to whether the
Wheeler well was in service or not, or only being used in a limited capacity. Appellant stated the
Wheeler well served only three customers and that a cooling tower was about to go online. (12) Young
testified: "I am not sure what we came away with that day verbally." Consideration was given to
amending the earlier proposed administrative order. Young wanted to determine if the Wheeler well
was "off" and if the cooling tower had been finally installed. On August 30, 1996, Young learned
the results of the benzene tests on August 28th. She then telephoned appellant's staff at the water
system about the benzene results and asked them to make sure the Wheeler well was off. On
September 4, 1996, Young made a personal trip to the water system and met with Thad Wilkinson,
an inspector, and appellant. Other water samples were taken, and a discussion about the benzene
problems followed. Young assumed that the Wheeler well was off, and appellant said a cooling
tower would have its electricity within a week. 

 Thereafter, Young updated the proposed administrative order and mailed it to
appellant offering a discount on penalties but giving only a fourteen-day period to respond instead
of the normal thirty days. Concerned that appellant would not pick up his mail, Young called the
water system staff and stressed the importance of reading the proposed order. On November 18,
1996, Young received a message from appellant asking if they could "talk about this deal." She was
unable to reach appellant by telephone that day. On November 19, 1996, the deadline for response,
Young received a complaint about a water outage. She reached appellant by telephone. Appellant
told Young that he was not going to sign the order, that her agency had pushed him as far as they
could. He threatened to sue Young and report her to the Governor. Young described appellant as
being belligerent and dismissive of the importance of "what we were trying to do." The deadline
for response having passed, Young referred the case to the litigation division of TNRCC. Young
sent appellant a letter on December 3, 1996, explaining this action. On February 14, 1997, the
litigation division sent appellant a letter informing him that it would seek an administrative penalty
of $50,000. When appellant asked for a hearing, TNRCC decided to sue. The case was turned over
to the criminal investigation division of TNRCC in February of 1997. A search warrant was
executed on appellant's water system property on May 20, 1997. The indictment was returned on
October 27, 1999. 

 Jeff Rowley, a former employee at the Choke Creek Water System, testified for the
State. Rowley had worked for appellant from August 24, 1994, until July 1996. He recalled when
the TNRCC discovered benzene in the water from the Wheeler well in January 1996. The agency
contacted appellant's staff on January 16, 1996 about one of the tests. On the same day, a certified
letter from the agency arrived but the staff, according to appellant's orders, was prohibited from
picking it up. Apparently after the second test in January 1996, Manuel Saenz of TNRCC told the
staff to shut off the Wheeler well, which they did. When contacted about the situation on January
25, 1996, appellant told his employees to let the customers go without water, "then we can see what
the TNRCC wants us to do without any water." Rowley stated that appellant's attitude about water
quality was that "if it's wet, it's good." On January 29, 1996, Saenz appeared at the water system
bringing a copy of the notice of violation form of January 24, 1996. The notice gave the system
fourteen days to notify customers of the benzene violation. Rowley never saw any notice distributed. 
He reported that an unsuccessful effort was made to run water from the Woodward well to the
Wheeler storage tanks. The Wheeler well went back into service after a few days. It was the only
source of water for some customers, and the Enron gas plant was "a big account" and needed water. 
Rowley had never heard of Clarence Littlefield, an engineer who supposedly was consulted, nor did
he know of any work on the Wheeler well by the Pawlik Well Service of San Antonio. 

 James Jones, the operator of appellant's water system during part of the controversy
with TNRCC, testified for appellant, his uncle. Jones left the water system in March 1996. To
counter the testimony of Young and Rowley, Jones characterized appellant at the time as "just
aggravated and not knowing what to do." On January 12, 1996, Thad Wilkinson of TNRCC
informed Jones that the Wheeler well water had tested over the maximum contaminant level for
benzene at 9.8 micrograms per liter. (13) The Wheeler well was cut off on January 24, 1996, on the oral
instructions of Manuel Saenz of TNRCC. Mickey Garza of TNRCC was informed of this action the
next day. Upon appellant's instructions, Jones discussed the benzene problem with Clarence
Littlefield of Southwest Engineers in Gonzales. The idea of a cooling tower and other options were
mentioned. There were other conversations with well service companies. Jones and appellant
discussed the notice of violation letter from TNRCC dated January 24, 1996. They concluded the
letter did not tell them to shut off the Wheeler well so long as they hired a professional engineer, and
gave quarterly notices to their customers about the benzene in the water. The Wheeler well was
returned to service despite the earlier oral instructions. It was decided that the drought had caused
the benzene to rise to the top of the water table, so a 100-gallon per minute submersible pump was
installed on the Wheeler well to eliminate the benzene. Appellant paid the Pawlik Well Service of
San Antonio around five thousand dollars for the installation, which was completed on March 7,
1996. This pump did not correct the problem, and the water still contained benzene above the
maximum contaminant level. 

 Clarence Littlefield testified that he quoted appellant a price of $14,543 to erect a
cooling tower for the Wheeler well. This quoted price did not include the cost of installation, labor
and any sales taxes. (14) Littlefield admitted that he did not construct a cooling tower for appellant. 

 Roy McBee, who worked for appellant in other areas, testified that he was employed
at the water system in March 1996. He explained the efforts made to blend the water from the
Woodward well with that of the Wheeler well to lower the amount of benzene in the water being
distributed. This method had been suggested by TNRCC employees, but the efforts were
unsuccessful. McBee had worked in oil fields and was not generally concerned about contact with
benzene, but he testified that he would not want his two-year-old child exposed to drinking water
containing benzene. 

 Appellant introduced on cross-examination of Mike Lannen, a TNRCC employee in
the public drinking water section, appellant's letter to Lannen of April 10, 1996, in response to
TNRCC's letter of March 28, 1996. Appellant's letter referred to the reworking of the Wheeler well
and the fact that water from that well was being blended with water from the Woodward well. 
Appellant claimed that TNRCC was thus informed the Wheeler well was back in service. 

 Dr. Lucy Frazier, a toxicologist with ENSR International in Austin, testified that she
was employed by TNRCC between 1994 and 1998 in the risk assessment section. Frazier testified
that, based on the federal Environmental Protection Agency (EPA) standards published on health
risk estimates and toxicity factors or values, the EPA had calculated that if a person was to drink two
liters of water a day containing 1 to 10 micrograms of benzene per liter, and that he did so for
seventy years, there would be one in a million chances of contracting cancer. Frazier stated these
EPA standards showed that if a person drank two liters a day of water containing ten to one hundred
micrograms per liter of benzene for seventy years, there would be one in 100,000 chances of
contracting cancer. Further, if a person were to drink two liters of water a day containing from 100
to 1,000 micrograms of benzene for seventy years, there would be one in 10,000 chances of
contracting cancer. Frazier acknowledged that the federal and state maximum contaminant level for
benzene was five micrograms per liter. In her personal opinion, she considered ten micrograms of
benzene per liter to be safe for drinking water purposes. 

 Dr. Thomas Dideck, an environmental toxicologist, also testified for the defense to
essentially the same opinion as Dr. Frazier. Dr. Robert Benson from the EPA had earlier testified
on cross-examination as to the same EPA toxicity factors. He, however, considered any drinking
water containing over five micrograms per liter of benzene to be unacceptable, and in his opinion,
not an adequate drinking water system. 


Legal Sufficiency

 In his first point of error, appellant contends that the "evidence is legally insufficient
to prove that appellant failed to provide 'adequate' water, if adequacy is measured by applicable state
regulations." 


Standard of Review

 In determining whether the evidence is legally sufficient to support the judgment, we
view the evidence in the light most favorable to the judgment, asking whether any rational trier of
fact could have found beyond a reasonable doubt all the essential elements of the offense charged. 
See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Lane v. State, 933 S.W.2d 504, 507 (Tex. Crim.
App. 1996); Emery v. State, 881 S.W.2d 702, 705 (Tex. Crim. App. 1994).

 The evidence, viewed in this light, and all reasonable inferences drawn therefrom, are
evaluated in this review. See Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). A
reviewing court must consider all evidence, rightly or wrongly admitted, that the trier of fact was
permitted to consider. See Garcia v. State, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); Johnson
v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The standard of review is the same for both
direct and circumstantial evidence cases. Green v. State, 840 S.W.2d 394, 401 (Tex. Crim. App.
1992). Appellate courts measure the legal sufficiency of the evidence against a hypothetically
correct charge. See Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In analyzing a
challenge to the legal sufficiency of the evidence, the reviewing court does not realign, disregard,
or weigh the evidence. Margraves v. State, 34 S.W.3d 912, 917 (Tex. Crim. App. 2000); Rodriguez
v. State, 939 S.W.2d 211, 218 (Tex. App.--Austin 1997, no pet.). The jury as the trier of fact is the
sole judge of the credibility of the witnesses and the weight to be given the testimony, and may
accept or reject all or any of any witness's testimony. See Sharp v. State, 707 S.W.2d 611, 614 (Tex.
Crim. App. 1986); Williams v. State, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). Reconciliation
of evidentiary conflicts is solely the function of the trier of fact. See Miranda v. State, 813 S.W.2d
724, 733-34 (Tex. App.--San Antonio 1991, pet. ref'd); Juarez v. State, 796 S.W.2d 523, 524 (Tex.
App.--San Antonio 1990, pet. ref'd). Moreover, the evidence is not rendered insufficient merely
because the defendant presented a different version of the events. Turro v. State, 867 S.W.2d 43,
47-48 (Tex. Crim. App. 1993). 

 At the outset, appellant notes that section 13.250(a) of the water code, under which
appellant was convicted, does not define the word "adequate," and, that as a result, the trial court did
not define the term for the jury in its charge. Appellant contends that this Court must resolve the
meaning of "adequate" because the sufficiency of the evidence can only be measured against a
"hypothetically correct" jury charge, not the one given at trial. Malik, 954 S.W.2d at 240. Appellant
urges that this is a question of first impression, and this Court must first decide whether the word
"adequate" [as used in the statute] is to be construed in light of applicable administrative regulations,
and, if so, which regulations. Appellant argues that if section 13.250(a) is not to be interpreted by
the regulations, the question will be what the ordinary meaning of the word was in this case. While
appellant uses phrases such as "adequate water" and "if adequate means safe," he offers no proposed
definition of "adequate," which he contends was legally required in the instant case. What appellant
overlooks is that section 13.250(a) imposes a duty on a retail public utility to "render continuous and
adequate service." The indictment charged an omission--a failure to render continuous and
adequate service. As used in the statute and the indictment, "adequate" modifies "service." 
"Adequate" is not defined in the water code or penal code. It should be given its ordinary meaning. 
"Words and phrases shall be read in context and construed according to the rules of grammar and
common usage." Tex. Gov't Code Ann. § 311.011(a) (West 1998); Ex parte Anderson, 902 S.W.2d
695, 699 (Tex. App.--Austin 1995, pet. ref'd). "Adequate" is normally defined as "able to satisfy
a requirement; suitable." American Heritage Dictionary of the English Language (1973) at 15. This
is the common usage and understanding of the word. As observed, "adequate" simply modifies
"service." 

 "Service" is defined for the purposes of Chapter 13 of the water code.


'Service' means any act performed, anything furnished or supplied, and any facilities
or lines committed or used by a retail public utility in the performance of its duties
under this chapter to its patrons, employees, other retail public utilities, and the
public, as well as the interchange of facilities between two or more retail public
utilities.



Tex. Water Code Ann. § 13.002(21) (West 1998).

 The application paragraph of the court's charge generally tracked the amended
indictment requiring inter alia, the jury to find beyond a reasonable doubt that appellant "did then
and there willfully and knowingly fail to render continuous and adequate service within its certified
area." "Service," being statutorily defined, should have had its definition submitted to the jury in
the court's charge. It was not. There was, however, no objection or special requested charge. 
Interestingly, neither party has cited the section 13.02(21) defining "service" or has discussed it into
their briefs. We view the legal sufficiency issue in the light of a "hypothetical correct" jury charge,
Malik, 953 S.W.2d at 240, which charge would include the said statutory definition. 

 We interpret a statute in accordance with the plain meaning of its language unless the
language is ambiguous or the plain meaning leads to absurd results. Boykin v. State, 818 S.W.2d
782, 785-86 (Tex. Crim. App. 1991). We do not find the language in section 13.250(a) of the water
code to be ambiguous or that its plain meaning leads to absurd results. We reject appellant's
argument that this Court must define "adequate" for the purposes of this case before deciding the
legal sufficiency issue he has raised. Moreover, we do not find that the words "adequate service"
must of necessity be tied to administrative regulations in alleging a criminal offense. 

 In the second part of his legal sufficiency argument, appellant asserts that the State
failed to prove its case beyond a reasonable doubt because the violation alleged in the indictment was
not shown to have been determined by certain provisions of the Texas Administrative Code requiring
quarterly monitoring. See 30 Tex. Admin. Code § 290.109(b)(11)(A). (15) Appellant asserts that if a
violatile organic chemical contaminant listed in section 290.103(3)(B) including benzene has been
detected at a level exceeding 0.005 mg/liter or five micrograms per liter, then there must be quarterly
monitoring. Appellant argues that his water system was placed on quarterly monitoring in February
1996 or earlier, that TNRCC did not conduct the quarterly monitoring properly by not testing during
some of the quarters. Appellant relies upon his cross-examination of Ron Bearden, a team leader
of the TNRCC chemical monitoring section. At one point in the interrogation, appellant took the
January 12 and 19, 1996 tests of 9.2 and 9.4 micrograms per liter of benzene and averaged them at
9.3 for the first quarter, developed that there was no testing in the second quarter and used a zero,
averaged the 5.4 test in August with the September test of 6.3 and got 5.8 as the average for the third
quarter, and added zero for the fourth quarter where the October test revealed less than five
micrograms per liter. Appellant came up with a 15.1 figure divided by four which he claimed
showed an annual average of 3.7 micrograms of benzene per liter. Thus, appellant contends that
there was a successful compliance under the quarterly reporting system and that he cannot legally
be prosecuted criminally as alleged. 

 The record supports both the fact that appellant's water system was placed on
quarterly monitoring in February 1996 and that oral TNRCC instructions were given to shut down
the Wheeler well in January. The well apparently was out of service for only a few days. In June
1996, Dorothy Young was still trying to determine whether the Wheeler well was in or out of
service. Appellant urges that his letter of April 10, 1996, to TNRCC about the work on the well was
sufficient to alert TNRCC that the well was in service, although the improvements were shown not
to have corrected the benzene problem. 

 It matters not whether TNRCC carried out the quarterly monitoring properly or was
misled. Successful monitoring for four quarters under section 290.109(b)(11), (12), and (15)(A), (B)
of the administrative code would entitle appellant to return to an annual or less frequent inspection
schedule of the water from his retail public utility. It would not, however, exempt him from criminal
prosecution under the water code. The State is not required to wait a year until the completion of
quarterly monitoring before taking administrative action to protect public drinking water or to seek
criminal prosecution for the failure to render continuous and adequate service by a public utility
company. Moreover, the evidence shows tests exceeding five micrograms of benzene per liter
before, after, and during the quarterly monitoring period to support the jury's verdict. 

 Other than the two parts of point of error one discussed, appellant has not briefed,
cited authorities, presented argument, or challenged the evidence supporting particular elements of
the offense. Nothing is presented for review in this regard. See Rocha v. State, 16 S.W.3d 1, 20
(Tex. Crim. App. 2000); McFarland v. State, 928 S.W.2d 482, 512 (Tex. Crim. App. 1996); Tex.
R. App. P. 38.1(h). 

 Viewing all the evidence in the light most favorable to the jury's verdict, we conclude
a rational trier of fact could have found beyond a reasonable doubt all the essential elements of the
offense charged. The first point of error is overruled. 


Factual Sufficiency

 In his second point of error, appellant contends that the "evidence is factually
insufficient to prove 'adequate' water, if 'adequate' means 'safe.'" Thus, appellant conditions and
limits his contention. 

 In his brief, appellant states:


Before discussing the issue of whether appellant's water system was "adequate" in
the sense that the water was safe to drink, appellant would reiterate that this case was
not tried on that theory. Instead, as noted earlier, the prosecution argued that the jury
charge did not define "adequate" to mean "safe," (16) and insisted that the case was
about the fact the MCL levels were exceeded." . . . If the Court should somehow
decide, however, that the word "adequate" should not be construed by looking to the
applicable regulations, the alternative is to use the ordinary, every day definition of
"adequate." In this case, moreover, "adequate" could only mean "safe," because
there is no allegation, for example, that appellant did not provide enough drinking
water, or that anything was wrong with the water other than the benzene levels. The
issue then becomes, therefore, whether the evidence was sufficient to show that the
water was not "safe." 



 With this being appellant's argument that the evidence is factually insufficient to
sustain the conviction, we turn to the standard of review. 


Standard of Review

 In a factual sufficiency review, we begin with a presumption that the evidence is
legally sufficient to sustain the convictions. Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App.
1996). However, in a factual sufficiency analysis, we view all the evidence without the prism of "in
the light most favorable to the prosecution as in a legal sufficiency challenge." Id. at 129; Hitt v.
State, 53 S.W.3d 697, 709 (Tex. App.--Austin 2001, pet. ref'd). A reviewing court must consider
all the evidence in a neutral light, impartially comparing evidence that tends to prove the existence
of a disputed fact or facts with evidence that tends to disprove that fact or facts. See Santellan v.
State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997); Jones v. State, 944 S.W.2d 642, 647 (Tex.
Crim. App. 1996). Deference is given to the jury verdict, as well as the determination involving the
credibility and demeanor of the witnesses. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App.
1997). 

 A reviewing court must avoid substituting its own judgment for that of a fact finder. 
Sells v. State, 121 S.W.3d 748, 758 (Tex. Crim. App. 2003); Westbrook v. State, 29 S.W.3d 103, 112
(Tex. Crim. App. 2000). Early on, it was felt that a jury verdict is to be set aside "only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." Cain, 958
S.W.2d at 410; Clewis, 922 S.W.2d at 129. 

 In Johnson v. State, 23 S.W.3d 1 (Tex. Crim. App. 2000), the court expanded the
Clewis standard of review in factual sufficiency cases to include both formulations from the civil
law. There, the court stated:


[T]he complete and correct standard a reviewing court must follow to conduct a
Clewis factual sufficiency review of the elements of a criminal offense asks whether
a neutral review of all the evidence, both for and against the finding, demonstrates
that the proof of guilt is so obviously weak as to undermine confidence in the jury's
determination, or the proof of guilt, although adequate if taken alone, is greatly
outweighed by contrary proof. Adoption of this complete standard allows us to
remain true to one of the stated goals of Clewis, harmonization, when appropriate,
of civil and criminal jurisprudence, and it recognizes the State's burden at a criminal
trial is proof beyond a reasonable doubt. 



Id. at 11. 

 In Zuliani v. State, 97 S.W.3d 589 (Tex. Crim. App. 2003), the Court sought to clarify
the complete civil appellate law formulations adopted in Johnson as the standards to be followed for
factual insufficiency. Id. at 595-96. Citing Johnson, the Zuliani court wrote:


Which standard applies generally depends on whether the complaining party had the
burden of proof at trial. Id. at 9-10. If the complaining party did not have the burden
of proof at trial, then the first or manifestly unjust standard applies. Id. at 10. If the
complaining party on appeal had the burden of proof at trial, then the second or
against the great weight and preponderance standard applies. Ibid.


We have, however, slightly modified this approach when a defendant challenges the
factual sufficiency of a guilt finding. If the defendant challenges the factual
sufficiency of the elements of the offense on appeal, even though the State has the
burden of proof, the reviewing court must review the evidence using both standards. 
Id. at 11; see also Goodman v. State, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001). 
In other words, the reviewing court asks whether "a neutral review of all the evidence
. . . demonstrates that the proof of guilt is so obviously weak as to undermine
confidence in the jury's determination, or the proof of guilt, although adequate if
taken alone, is greatly outweighed by contrary proof." Johnson, 23 S.W.3d at 11. 


Zuliani, 97 S.W.3d at 595-96. 



 Only recently, the Texas Court of Criminal Appeals acknowledged that the evolution
of factual sufficiency review since Clewis has been somewhat confusing. Zuniga v. State, ___
S.W.3d ___, No. 539-02, slip op. at 6 (Tex. Crim. App.--April 21, 2004). Finding fault with the
burden of proof language inter alia in Johnson, 23 S.W.3d at 11; Goodman v. State, 66 S.W.3d 283,
285 (Tex. Crim. App. 2001); and Zuliani, 97 S.W.3d at 593-94; and finding persuasive the opinion
in In re C.H., 89 S.W.3d 17, 25, 45 (Tex. 2002), the court concluded that the burden of proof at trial
necessarily affects appellate review of the evidence. Zuniga, slip op. at 7. The court sought again
to clarify the required review. It stated:


We will attempt to resolve some of the confusion created by the standard that has
developed since Clewis by: 1) linking the burden of proof at trial to the standard of
review and 2) avoiding language suggestive of a preponderance-of-the-evidence
burden of proof. This does not alter the standards elucidated since Clewis, rather it
serves only to synthesize the ideas each decision has provided and to acknowledge
the necessity for appellate courts to consider the burden of proof at trial when
reviewing the factual sufficiency of the evidence. There is only one question to be
answered in a factual-sufficiency review: Considering all of the evidence in a neutral
light, was a jury rationally justified in finding guilt beyond a reasonable doubt? 
However, there are two ways in which the evidence may be insufficient. First, when
considered by itself, evidence supporting the verdict may be too weak to support the
finding of guilt beyond a reasonable doubt. Second, there may be both evidence
supporting the verdict and evidence contrary to the verdict. Weighing all the
evidence under this balancing scale, the contrary evidence may be strong enough that
the beyond-a-reasonable-doubt standard could not have been met, so the guilty
verdict should not stand. This standard acknowledges that evidence of guilt can
"preponderate" in favor of conviction but still be insufficient to prove the elements
of the crime beyond a reasonable doubt. Stated another way, evidence supporting
guilt can "outweigh" the contrary proof and still be factually insufficient under a
beyond-a-reasonable-doubt standard. 



Id. slip op. at 8. 

 With this background, we note that appellant acknowledged the standard of review
by citing Johnson, 23 S.W.3d at 7, 11, and Hitt, 53 S.W.3d at 709. He, however, does not apply the
standard to the instant conviction based on the allegations in the indictment. He does not review the
proof or lack of proof supporting these allegations--the elements of the offense charged. Further,
appellant does not claim that, considered by itself, the evidence supporting the verdict is too weak
to sustain the finding of guilt beyond a reasonable doubt nor does he use the balancing scale between
the evidence supporting the verdict and evidence contrary to the verdict. 

 As noted, appellant argues a theory on which the case was not tried. He contends that
since the State did not prove that the "water" was unsafe, the evidence was factually insufficient to
sustain the conviction. Appellant switches the focus from the evidence concerning the allegations
in the indictment to his own chosen theory. Appellant relies upon the testimony of his experts, Drs.
Frazier and Dideck, and the cross-examination of Dr. Benson about EPA standards regarding health
risk factors and toxicity values concerning benzene in drinking water. Drs. Frazier and Dideck
expressed the opinion that the water from the Wheeler well was "safe" despite tests showing that
maximum contaminant levels of benzene in the water had exceeded the administrative regulations
as alleged in the indictment. In view of the amount of benzene, a known carcinogen, in the water
as shown by the tests, Dr. Benson estimated that the water would not be adequate for people to
consume. Doug Holcomb, manager of the utilities and district section of the Water Supply Division
of TNRCC, stated that the 13 micrograms per liter of benzene in the Wheeler well water as tested
in March 19, 1997, violated minimum drinking water standards, and he would not consider it an
adequate water supply. Jimmy Jones, appellant's operator, stated that he would not want to drink
water with benzene in it. Ray McBee, one of appellant's employees, would not want to expose his
two-year-old child to water containing benzene. 

 Appellant argues that under his theory the evidence was overwhelming that the
Wheeler well water was safe. He argues:


In short, even if the Court believed that the State did not have to prove that
appellant's water system was inadequate as measured by the State's own regulations,
but could rely on opinion testimony that the water was not "adequate," the State still
did not establish that the water was unsafe. Unless "adequate" means strict
adherence to a five micrograms per liter test having nothing to do with safety,
appellant's conviction cannot stand.



 Appellant does not apply the standard of review for factual sufficiency to the elements
of the offense as charged. Appellant offers an equitable argument that there was strong evidence that
his well water was "safe" based on opinion testimony and current EPA standards on health risk
estimates and toxicity values, despite any concentration of benzene in the water that was shown to
exceed the maximum contaminant levels of the TNRCC and the EPA. He claims that this evidence
shows that the water was "adequate," probably meaning that the "service" rendered was adequate
as required by the statute. We reject appellant's argument because it is based on a theory upon which
the case was not tried. 

 We have reviewed all the evidence in a neutral light and conclude that the jury was
rationally justified in finding appellant guilty beyond a reasonable doubt as charged in the amended
version of count II of the indictment. The evidence supporting the verdict, standing alone and
considered by itself, was not too weak to support the finding of guilty beyond a reasonable doubt. 
Moreover, considering impartially the evidence supporting the verdict and the evidence contrary to
the verdict under a balancing scale as stated in Zuniga, we find that the beyond a reasonable doubt
standard has been met with regard to factual sufficiency. The second point of error is overruled. 

 The judgment is affirmed.


 

 John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Puryear and Onion*

Affirmed

Filed: August 26, 2004

Publish

* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1.   The current code provisions are to be found in 30 Tex. Admin. Code § 104(c)(2) (2004).
2.   The current code provisions are to be found in 30 Tex. Admin. Code § 291.93(a) (2004).
3.   Section 1.03(a), (b) of the Penal Code provides:



 Conduct does not constitute an offense unless it is defined as an offense by
statute, municipal ordinance, order of a county commissioners court, or rule
authorized by and lawfully adopted under a statute. 

 The provisions of Titles 1, 2, and 3 apply to offenses defined by other laws,
unless the statute defining the offense provides otherwise; however, the
punishment affixed to an offense defined outside this code shall be
applicable unless the punishment is classified in accordance with this code. 



Tex. Pen. Code Ann. § 1.03(a), (b) (West 2003). Section 1.03 appears to make the penal code
supreme to all offenses defined elsewhere. See 6 Michael Charlton, Texas Practice: Criminal Law
§ 1.2 (2001). All statutes listed under Titles 1, 2 and 3 of the penal code (§§ 1.01-12.51) apply to
all offenses defined outside the penal code. Tex. Pen. Code Ann. § 1.03(b) (West 2003). 
Accordingly, the general purposes of the penal code, see Tex. Pen. Code Ann. § 1.02(2), (4) (West
2003), the definitions set forth in section 1.07(a), see § 1.07(a) (West 2003) and conduct constituting
an offense, see id. § 6.01 (West 2003), all apply to offenses established by the legislature.
4.   An individual adjudged guilty of a felony of the third degree shall be punished by
imprisonment in the institutional division for any term of not more than ten years or less than two
years, and, in addition, a fine not to exceed $10,000. See Tex. Pen. Code Ann. § 12.34(a), (b) (West
2003).
5.   Section 13.2501 provides:


The holder of a certificate of public convenience and necessity shall refuse to
service a customer within its certified area if the holder of the certificate is
prohibited from providing the service under Section 212.012 or 232.0047, Local
Government Code.


Tex. Water Code Ann. § 13.2501 (West 2000).
6.   The current code is cited for convenience. The quoted part of section 290.101 has
remained unchanged from the time of alleged offense. 30 Tex. Admin. Code section 290.101 was
adopted to be effective April 15, 1994, 19 Tex. Reg. 2242; amended to be effective September 11,
2000, 25 Tex. Reg. 8880.
7.   The witnesses used the terminology of "five micrograms per liter of benzene" as the
maximum contaminant level testifying that it was the same as "0.005 mg/l."
8.   The provisions of 30 Tex. Admin. Code section 291.93(b) adopted to be effective October
9, 1990, 15 Tex. Reg. 4019; amended to be effective January 10, 1996, 21 Tex. Reg. 114.
9.   The indictment was returned by a Travis County grand jury. The cause was tried in the
147th Judicial District Court of Travis County. Section 13.419 of the Texas Water Code provides:


Suits for injunction or penalties under this chapter may be brought in Travis
County, in any county where this violation is alleged to have occurred, or in the
county or residence of any defendant.


Tex. Water Code Ann. § 13.419 (West 2000). No question of proper venue has been raised.
10.   As the Commission was known as TNRCC at all pertinent times, we shall use that
terminology as it was used at trial.
11.    All test data mentioned concerns water taken from entry point number one of the Wheeler
well unless otherwise noted.
12.   The number of customers given was inaccurate and no cooling tower for the Wheeler well
was ever erected.
13.   Jones testified that on that date Wilkinson told him "that TNRCC was after Rex's
[appellant's] ass."
14.   The State noted that a cooling tower would cost more than $23,000. In jury argument,
without objection, the State urged that appellant was more interested in saving money than in
protecting the public.
15.   Subsections (12) and (15)(A), (B) of section 290.109(b) provided:



 Systems which violate the VOC MCLs of § 290.103(3)(B) of this title, as
determined by paragraph (15) of this subsection, must monitor quarterly. 
After a minimum of four consecutive quarterly samples which show the
system is in compliance as specified in paragraph (15) of this subsection
and the commission determines that the system is reliably and consistently
below the maximum contaminant level, the system may monitor at the
frequency and time specified in paragraph (11)(C) of this subsection. 



. . . . 



 Compliance with § 290.103(3)(B) of this title shall be determined based
on the analytical results obtained at each sampling point.




 For systems which are conducting monitoring at a frequency greater
than annual, compliance is determined by a running annual average
of all samples taken at each sampling point. If the annual average of
any sampling point is greater than the MCL, then the system is out
of compliance. If the initial sample or a subsequent sample would
cause the annual average to be exceeded, then the system is out of
compliance immediately.

 If monitoring is conducted annually, or less frequently, the system is
out of compliance if the level of a contaminant at any sampling point
is greater than the MCL. If a confirmation sample is required by the
commission, the determination of compliance will be based on the
average of the two samples. 



30 Tex. Admin. Code § 290.109(b), 11(A), (12), (15)(A), (B) (West 1997).
16.   The State's jury argument was in response to appellant's argument that water delivered
by appellant was "safe" in light of the testimony about EPA standards on risk factors and toxicity
values.